UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
JENNIFER COLLINS,

        Plaintiff,

– against –

CHRISTOPHER ROCKEFELLER LINDSTROM;
GIVING BACK FUND, INC.; and NEXUS GLOBAL

        Defendants.
-------------------------------------------------------------------

**PLAINTIFF'S AFFIDAVIT**

**ASSIGNED JUDGE:**

**JURY TRIAL DEMANDED**

I, Jennifer Collins, being duly sworn, hereby deposes and says:

**PRELIMINARY STATEMENT**

1. I bring this action to hold Defendant Mr. Christopher Rockefeller Lindstrom ("Mr. Lindstrom") accountable for slandering me, and permitting this slander to cause me emotional distress, by causing untruthful statements about me to be communicated to Defendant Nexus Global ("NEXUS"), and for Defendant NEXUS having exhibited deliberate indifference by failing to verify that slander, and for causing me to be barred from a NEXUS Summit to which I had been previously accepted to attend, with a scholarship, prior to the slanderous remarks having been communicated.

2. I similarly bring this action in order to protect my rights under Section 504 of the Rehabilitation Act of 1973 Pub. L. No. 93-112, 87 Stat. 394 (Sept. 26, 1973), codified at 29 U.S.C. 701 et. seq. which were violated when NEXUS made a decision to exclude me from participation in its Global Youth Summit without conducting an investigation of the facts concerning the underlying reasons for why Defendant Mr. Lindstrom felt the need to slander me and thereby did exhibit deliberate indifference with knowledge that I suffer from bipolar disorder.

3. The NEXUS Summit was announced by Defendant NEXUS as follows: "The 4th annual NEXUS USA Summit will convene on January 31 – February

2, 2018 in Washington, DC. It brings together young philanthropists, impact investors, and allies – including family business members, successful entrepreneurs, and inspiring social change leaders. They will discuss challenges facing our country and the world today and innovative solutions to address them. *See* "NEXUS Global Youth Summit Announcement" attached hereto as Exhibit "**A**."

4. Because of the statements made by Mr. Lindstrom to NEXUS, which I believe were made in violation of New York State laws prohibiting slander, I was barred from an event through which I believe I would have been in a position to establish relationships which could have profoundly benefitted my career goals, and pursuits, of making a living while impacting society in a positive way.

## MY INITIAL IMPRESSION OF MR. LINDSTROM WAS THAT HE WAS COMMITTED TO THE PUBLIC INTEREST

5. I met Mr. Lindstrom through a mutual acquaintance who was acting as the caretaker of a property in Amenia, New York, which was in jeopardy of being foreclosed on at the time of our initial meeting.

6. I was a paid consultant for "ARC 38"(the not-for-profit which was stewarding the land in Amenia which was under threat of foreclosure) and was assigned with the fund raising efforts for the property.

7. Mr. Lindstom and I worked together in a professional capacity to ensure that the land would remain owned by partners of "ARC-38" which had been opened up to travelers and those who had no place to go.

8. Mr. Lindstrom was gracious enough to provide a 6-month bridge loan to "ARC-38" of $184,000 and the property was brought out of foreclosure on or about April of 2017.

9. Following the closing on the property, I was assigned with assisting the refinancing of Mr. Lindstrom's bridge loan and/or renegotiating the terms of the loan.

10. I met Mr. Lindstrom for the first time alone at a coffee shop near my home in Brooklyn.

11. Upon our meeting regarding the bridge loan, I felt as though Mr.

Lindstrom and I had additional commonalities concerning our business pursuits including broader land-stewardship initiatives, cryptocurrency, and health and wellness programs, so I asked to see him again.

12. Mr. Lindstrom and I saw each other again at Mr. Lindstrom's farm in Hudson, New York in the Summer of 2017 and we mostly spoke of our business affairs except for the moment when Mr. Lindstrom grabbed my phone out of my hand and scrolled through my private photos which included a naked picture of me.

13. At the conclusion of our day together, Mr. Lindstrom requested we have dinner together in response to my interest in sharing my business plans with him.

14. At dinner, I showed Mr. Lindstrom my business plans and he stated that he could introduce me to one of his friends who was working on similar initiatives and disclosed his relationship with Defendant NEXUS.

15. The evening ended without any physical contact of any kind.

16. Mr. Lindstrom and I communicated via text after we went our separate ways that night.

17. Mr. Lindstrom wrote, via text, "Please send some of those photos from the Hemp field! And maybe the shower one, too?" *See* "Text Message Requesting Pictures" attached hereto as Exhibit "**B**."

18. Mr. Lindstrom offered to paint a portrait of me based on the nude photos he had seen of me and I agreed.

19. Mr. Lindstrom and I exchanged text messages pertaining to the NEXUS Summit sometime in the Summer of 2017, through which I expressed interest in the NEXUS Summit:

> "If there's a spot at nexus for me I'd love to attend!!! I'm sure it's too late but seems oh so juicy" and Mr. Lindstrom replied:

"I wish there was...it filled up a long time ago. I can endorse you for the US Summit in February." *See* "Offer of Endorsement" attached hereto as Exhibit "**C**."

20. Mr. Lindstrom and I met for the third time at a restaurant in Brooklyn, during which meeting Mr. Lindstrom divulged the information to me that he was romantically involved with a woman who is twenty years his elder and who is also involved quite seriously with another man.

21. At no time did Mr. Lindstrom disclose to me that the woman he was romantically involved with, Claudia Welss, held a prominent position in the NEXUS organization..

22. After our dinner together, Mr. Lindstrom kissed me, held my hand, walked me to his car, kissed me again, and drove me home.

23. At the dinner, I communicated to Mr. Lindstrom that I wouldn't feel comfortable moving beyond kissing until I knew how his other partner felt and that I was uncomfortable because of our business relationship.

24. Mr. Lindstrom agreed and we resisted any further physical actions.

25. I sent Mr. Lindstrom a text stating that I wanted to take things slow and Mr. Lindstrom agreed but also stated that he felt "sexually frustrated." *See* "Sexually Frustrated Text Message" attached hereto as Exhibit "**D**."

### I WAS DRAWN IN BY MR. LINDSTROM'S COMPASSION FOR IMPORTANT ISSUES AND, AFTER HAVING CONSENSUAL SEX JUST A COUPLE OF TIMES, WAS DISTURBED BY THE FACT THAT MR. LINDSTROM HAD TAKEN MY EMOTIONS LIGHTLY DESPITE KNOWING I SUFFERED FROM BIPOLAR DISORDER

26. Mr. Lindstrom and I had consensual sex two times.

27. Mr. Lindstrom and I had intercourse during my second visit to his home in Hudson, NY and again on a hiking trip in New Hampshire in August of 2017.

28. Mr. Lindstrom informed me that he viewed our relationship as that of being friends because he was too in love with Claudia Welss.

29. I told Mr. Lindstrom that I felt "extremely used" and "devastated."

30. I stated that I felt my bipolar disorder (from an incident in which I had been raped) had been triggered.

31. I did my best to maintain a healthy, and friendly, professional relationship with Mr. Lindstrom after the events in New Hampshire in August of 2017.

32. Mr. Lindstrom and I made arrangements to see each other in October of

2017 in order for me to have the opportunity to express my emotions and difficulties as a result of the events in New Hampshire.

33. Mr. Lindstrom explained to me, at this meeting in October of 2017, that he had a lack of time.

34. The meeting in October of 2017 consisted mostly of a conversation related to our mutual business interests and I was not afforded the opportunity to speak with Mr. Lindstrom about our personal issues.

35. I sent Mr. Lindstrom an email addressing my discomfort with the abrupt ending to our sexual relationship and asking him to follow up with his multiple business promises that were made pre-intimacy and Mr. Lindstrom never responded. *See* "Discomfort E-Mail" attached hereto as Exhibit "**E**."

## I BECAME HOSPITALIZED

36. I was hospitalized at Maimonides Hospital, in Brooklyn, NY, between November 18, 2017, and November 28, 2017 for psychiatric purposes. *See* "Maimonides" attached hereto as Exhibit "**F**."

37. I was restrained with leather straps and injected with a sedative and divulged to both my doctors in the hospital (and my psychiatrist and psychologist at the outpatient clinic) that my episodes were directly related to feeling used and silenced by Mr. Lindstrom. *See* "Maimonides" attached hereto as Exhibit "**F**."

## I RECEIVED AN INVITATION TO ATTEND DEFENDANT NEXUS' SUMMIT AND INFORMED DEFENDANT LINDSTROM OF MY INTENT TO APPLY

38. Soon after my time at Maimonides Hospital, I received an e-mail inviting me to apply to the NEXUS Summit in Washington, DC. *See* "Email Invitation and Intent to Apply" attached hereto as Exhibit "**G**."

39. The invitation to the NEXUS Summit included an invitation to a film event in New york City.

40. I had submitted a short film to Sundance that I had presented to Mr. Lindstrom for potential investment in and so, seeking to re-engage Mr. Lindstrom in a business relationship, I e-mailed Mr. Lindstrom immediately and invited him to attend the movie group

with me.

41. Mr. Lindstrom did not respond to the invitation to attend the movie, and so I reached out to the film group and was invited to attend the event anyway on my own, where I built relationships with Nexus members based on my own merit and credibility.

42. On December 7, 2017, I told Mr. Lindstrom that I was going to apply to the NEXUS Summit event "no later than tomorrow." *See* "Invitation and Email Intent to Apply" attached hereto as Exhibit "**G**."

43. Late in the business day on December 8, 2017, I sent Mr. Lindstrom an e-mail with a copy of my NEXUS application. *See* "Email Application" attached hereto as Exhibit "**H**."

44. On December 11, 2017, I sent Mr. Lindstrom another e-mail inquiring as to whether he was available to meet. *See* "December 11, 2017 Email" attached hereto as exhibit "**I**."

### MR. LINDSTROM WAS MOSTLY UNRESPONSIVE TO MY EMAILS INFORMING HIM THAT I WAS APPLYING TO NEXUS and THAT I HAD BEEN ACCEPTED

45. Later in the evening of December 11, 2017, I sent Mr. Lindstrom a follow-up e-mail inquiring as to why he was being unresponsive to my messages. *See* "Evening Email dated December 11, 2017" attached hereto as Exhibit "**J**."

46. Mr. Lindstrom responded by stating that I had been "overbearing" and "manic" and that he was "very reluctant" to see me because I had been "inserting [myself] into" his networks without his approval. *See* "Lindstrom email" attached hereto as Exhibit "**K**."

47. I responded to Mr. Lindstrom's e-mail with a text message to express the urgency and dissatisfaction I was feeling with his refusal to meet and decided at this point to clearly inform him that his actions were what had triggered my symptoms by stating that, "have you ever thought my mania was triggered by you breaking all your promises and using your power to engage with me sexually when you had no heartspace for me???" *See* "Lindstrom email" attached hereto as Exhibit "**K**."

48. On December 24, 2017, I received an e-mail from NEXUS informing me

that I had been accepted to the Summit to be held in Washington, DC, in February of 2018 which included a list of the speakers for the event. *See* "Acceptance to Summit" attached hereto as Exhibit "**L**."

49. I sent NEXUS an e-mail on December 26, 2017, requesting a scholarship and informing them that I was pleased to find out that one of their speakers was from the Annie E. Casey Foundation which has provided funds to the think-tank which had aided me in getting my research off the ground.

50. On December 26, 2017, I forwarded Mr. Lindstrom a copy of my request for a scholarship to the NEXUS Summit for which I had been accepted and had received a scholarship. *See* "December 26, 2017, email" attached hereto as Exhibit "**M**."

51. Mr. Lindstrom never responded to my message of December 26, 2017.

### MR. LINDSTROM THREATENS TO SLANDER ME

52. On January 5, 2018, Mr. Lindstrom sent me an e-mail asserting that I was harassing him, that he would block my e-mails, that I was "not a fit" for NEXUS, and that he was planning on reporting me to NEXUS for applying "without" his "full consent." *See* "January 5, 2018, email" attached hereto as Exhibit "**N**."

53. I responded by telling Mr. Lindstrom that if he acted upon his threat and made false accusations to NEXUS about me, I would provide them with written evidence of his offer to endorse me and that I would inform them that he pulled his endorsement after I stopped sleeping with him. *See* Exhibit "**N**."

### NEXUS INFORMS ME THAT MY ACCEPTANCE HAS BEEN REVOKED TO WHICH I RESPONDED WITH A REQUEST FOR FURTHER INVESTIGATION OF WHICH THEY HAVE YET TO DO ANYTHING BEYOND TELLING ME THAT THEY HAD ELEVATED THEIR INVESTIGATION TO THEIR "VALUES COUNCIL"

54. On January 15, 2018, NEXUS responded to my inquiry as to my status by writing:

"Thank you for your interest in the 2018 NEXUS USA Summit. NEXUS reserves the right to reach out to existing members that applicants are connected to as references and to re-evaluate applications at any time. We

regret to inform you that we can no longer honor your acceptance to the 2018 Summit and have refunded the donation you made via Universe." *See* "January 15, 2018" attached hereto as Exhibit "**O**."

55. On January 15, 2018, I sent an e-mail disputing NEXUS' decision to revoke my acceptance to attend their Summit through which I informed the organization that:

"I have written evidence that Chris Lindstrom agreed to endorse me for this summit as well as evidence that I kept him informed of my intention to apply when the application was made public. At no time during my application process did he indicate to me that he had any problem with me applying. He was cc'd on every email, including my request for a scholarship.
If you reached out to Chris Lindstrom to check my reference and he denied his endorsement, it is a lie to keep me silent about his personal relationship with me, during which he abused his position of power (he was in a position where my collective owed him 184,000) and he used that as well as false promises to engage with me sexually.

If NEXUS is as progressive as on social issues as it appears to be, then the right thing to do in this situation is to review my evidence before making a decision to reject me from the summit.

As you know, all to well, female leaders are kept silent, and are oppressed, with their reputation damaged by powerful men and that is exactly what is going on here. With all due respect to your community, I request a full review of my evidence as well as a phone interview before you deny my application." *See* Exhibit "**O**."

56. I further informed NEXUS, through an e-mail on January 15, 2018, that:

"Chris shamed me for my diagnosis of PTSD and bipolar disorder, the symptoms of which were flaring up because of him taking advantage of me! Then, he refused to met with me in person to discuss either personal or business matters until I was 'centered' despite my explanation of my symptoms that were directly related to him taking advantage of me.
He then blatantly lied about being 'happy to meet up with me' despite my multiple attempts to achieve reconciliation in both professional and personal matters.

I have met several other NEXUS members who would be happy to endorse me for this summit and who have seen my work.

I come from a middle class family and my work is currently being reviewed by the Department of Housing and Urban Development as well as the Department of Integrative Medicine at USC. I have partners in Canada, Costa Rica, Norway that have solutions for carbon neutral energy efficient housing that also does green growing and aquaponics." *See* Exhibit "**O**."

57. On January 17, 2018, I provided NEXUS with the documentation showing that Mr. Lindstrom had indeed provided me his permission to utilize him as a reference. *See* "Email dated January 17, 2018" attached hereto as Exhibit "**P**."

58. NEXUS responded to my having informed them that Mr. Lindstrom had in fact provided me with permission to use him as a reference by telling me:

"Thank you for taking the time to share your concerns about the behavior of one of our members. This situation has been escalated to the NEXUS Values

Council, an independent body of NEXUS members who review and evaluate 'red flags' raised about our members on a monthly basis in relation to upholding the NEXUS values and community code of conduct. While a final decision on this matter will not be made in the next 2 weeks before the USA Summit, we shall reach out to you if the decision is made to invite you to future NEXUS events." *See* "January 18, 2018 E-Mail" attached hereto as Exhibit "**Q**"; *See also* "Values Council" attached hereto as Exhibit "**R**."

59. I responded to NEXUS with a request to send a delegate and specifically stated:

"Thank you for taking the appropriate steps to address this matter thoroughly. While I am pleased with initial steps that seem to be taken, I am curious how can I ensure that both sides of the story are given a fair review given that the nature of the organization is centered around families that have an immense amount of social power and delegates like myself have a relatively inconsequential voice (as evidenced by your immediate decision to revoke my acceptance and scholarship without even coming to me first)? What steps will NEXUS take to ensure my voice (as a person with bipolar disorder and complex PTSD) is adequately heard and understood in a safe space? In the time of #metoo movement and of the Times Up movement, I would find it absolutely necessary to be able to address any of Chris's concerns with my behavior that may seem to be a "red flag" outside of proper context - which is critically important - in person, or over the phone. I don't want to punish Chris. But I also don't want NEXUS to miss out on the vast amount of knowledge and intellectual capital that I have to offer in exchange for maintaining the status quo, keeping me silent, or make rash decisions based on incomplete stories. As such, I understand that unfortunately such a deliberation cannot possibly occur before the USA Summit. So, instead, I propose that NEXUS allow me to send a delegate in my place who can benefit greatly from the speakers and events you have planned and bring that information back to me. In addition, as a scholar from The New School, a former television celebrity, a poet, and a strategic analyst for an environmental sustainability organization, my proposed delegate will have a wealth of experience to offer. As a person of color, who also has struggled with homelessness, he would be an equally qualified candidate to represent my values and my organizations. His name is Preston Charles and he is ready and willing to fill out his application in full. I will submit my donation on his behalf, and gift him my train ticket which was already purchased by a generous sponsor.

Another Nexus member has already offered housing. Thanks for understanding that this would be the fairest solution for both Chris and I in this situation." *See* "Delegate Request Email" attached hereto as Exhibit "**S**."

60. Defendant NEXUS has perpetrated deliberate indifference by failing to reach out to me in any substantial way in order to verify allegations made against me or to request any further references.

## MR. LINDSTROM APOLOGIZES FOR HIS ACTIONS

61. On January 15, Mr. Lindstrom communicated to me his regret at having acted to have me lose my opportunity with NEXUS through an e-mail which stated that:

"So quick question, do you feel that you are not in your ego/fear space? That is a referral to your other accusation that I was acting out of ego fear.

Because...yeah, I was. And so are you. You're ego fear triggers my ego fear and so it goes. We are in a cloud unable to see each other. Or ourselves. Clearly." *See* "Apology Email" attached hereto as Exhibit "T."

62. In an e-mail dated January 28, 2018, Mr. Lindstrom admitted to having what constitutes malice in his actions in having me barred from attending the NEXUS Summit as follows:

I provided this question: "Specifically, why did you never get back to me about NEXUS when you said you would?"

Mr. Lindstrom answered, in pertinent part, as follows: "After receiving multiple injurious emails, I determined that it would not be safe or appropriate to invite someone into my network who seemed very ready to discredit me publicly. Also, after I saw the full extent of your mania and volatility, even if you didn't try to discredit me, I was very unsure whether being associated with you would undermine my own reputation within the network or lead to similar drama with someone else within NEXUS. To be perfectly blunt, I lost trust in you."

Ms. Collins provided the following question: "Are both you and Claudia planning on attending NEXUS US Summit Feb 2018 or not? If so, did this have any bearing on your reluctance to fulfill your promise?"

Mr. Lindstrom responded as follows: "This was not the primary reason but I certainly felt protective of Claudia. I did not want to have to draw anyone else into this drama and I had no way of knowing that it wasn't your intent to make a public spectacle of it." *See* "January 28, 2018, email" attached hereto as Exhibit "U."

## VERIFICATION

Jennifer Collins hereby affirms and verifies she is the Plaintiff in the instant action; that she has reviewed the Complaint dated July 17, 2018; and that she believes that, based upon matters within her personal knowledge, and on information and documents that have been assembled and provided to her, that her Affidavit is true and correct to the best of her knowledge.

*[signature: Jennifer Collins]*

Jennifer Collins  .

Sworn to me before this

23 day of July, 2018

*[signature: Emma Jean Pierre]*

NOTARY PUBLIC

```
EMMA JEAN PIERRE
Notary Public - State of New York
NO. 01JE6320379
Qualified in Kings County
My Commission Expires Mar 2, 2019
```